IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | * | |
|---|---|---|
| v. | * | Criminal No.: RDB-10-0398 |
| TRAVIS GAINES | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Defendant Travis Gaines has been charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant filed a motion to suppress all evidence stemming from an allegedly illegal traffic stop on January 26, 2010 in Baltimore, Maryland. (ECF No. 20.) The parties' submissions have been reviewed and this Court held a hearing on November 10, 2010 to consider the pending motion. This Court withheld ruling at that time, continued the hearing and ordered further briefing. *See* Order, ECF No. 39. The hearing was continued on December 6, 2010, at which time, for the reasons stated on the record, this Court GRANTED Defendant's Motion to Suppress Evidence. Although the Motion to Suppress Evidence has been granted, this Court thinks it prudent to more fully set forth the basis for that decision. Therefore, for the reasons that follow, Defendant's Motion to Suppress Evidence (ECF No. 20) is GRANTED.

## FINDINGS OF FACT

The Government and the Defendant in their written submissions to the Court and in oral argument essentially agree on the factual background of this case. On January 26, 2010, at approximately 1:30 p.m., Officers Jimmy Shetterly, Frank Schneider, and Manuel Moro were in a marked police vehicle and were patrolling in the vicinity of Pennsylvania Avenue and Mosher

Street in Baltimore City, an area that Officer Shetterly described as an "open-air drug market" with a "high rate of violence." (Transcript of Evidentiary Hearing held November 10, 2010, at 9, ECF No. 40) (hereinafter "Hr'g Tr."). Officers Shetterly, Schneider, and Moro are members of a proactive crime fighting unit of the Baltimore City Police Department known as the Central District Operations Unit. According to the testimony of those officers, instead of receiving and reacting to calls from a central police dispatcher, officers assigned to the Central District Operations Unit investigate and seek to prevent crime in Baltimore City.

Officer Schneider was driving the vehicle, Officer Shetterly was in the front passenger seat, and Officer Morow was seated in the rear of the police vehicle. The officers were travelling northbound on Pennsylvania Avenue approaching the Mosher Street intersection. Mr. Gaines was travelling in the rear passenger compartment of a white Ford Crown Victoria with tinted windows that was travelling southbound on Pennsylvania Avenue approaching the same intersection—the two cars were traveling in opposite directions on the same street. There were two other occupants of the Crown Victoria, Stephanie Edmonds was driving the vehicle, and Denise Hargrove was in the front passenger seat.

As the cars approached the intersection, Officer Moro testified that, from his position in the rear of the police cruiser, behind Officer Shetterly who was in the front passenger seat, he could see a crack in the right side of the windshield of the Crown Victoria as it approached the intersection. (Hr'g Tr. at 67-68). The traffic signals were green in both directions, and, without stopping, the Crown Victoria made a right turn onto Mosher Street from Pennsylvania Avenue. In response, the police vehicle made a left turn on Mosher Street, following behind the Crown Victoria carrying the Defendant. Officers Schneider and Moro testified that it was Officer Moro's observation of the crack in the windshield that was the impetus for turning the police car

left behind the Crown Victoria. (Hr'g Tr. at 63, 68). Officer Schneider specifically testified that he did not see the crack in the windshield at or approaching the intersection, but he became aware of it only after Officer Moro identified it and after the police car turned onto Mosher Street behind the Crown Victoria. (Hr'g Tr. at 56-57, 63). Officer Moro testified that he identified the cracked windshield to the other officers as the Crown Victoria was turning right from Pennsylvania Avenue onto Mosher Street. (Hr'g Tr. at 75, 77). Notably, Officer Moro's version of events indicates that from his position in the rear of the police vehicle, he could identify a crack in a windshield on the right passenger side of a car, turning right, away from the police vehicle, through his own vehicle's windshield, and across an intersection. All three officers testified that after they turned left onto Mosher Street following the Crown Victoria, they could see through the tinted rear window of the Crown Victoria and could identify the crack in the windshield, notwithstanding the fact that there were three passengers between the officers and the windshield. (Hr'g Tr. at 10, 57, 69).

The officers activated their lights and sirens and pulled the Crown Victoria over for a purported traffic stop. As the officers approached the vehicle, they observed the Defendant lean forward towards the front seats and make a shoving motion towards his waist band area. Officer Schneider approached the driver's side of the vehicle and spoke to the driver, Stephanie Edmonds. Officer Moro approached the passenger side of the car to speak to the front passenger, Denise Hargrove. Officer Shetterly positioned himself on the driver's side of the car, behind Officer Schneider. Upon asking for license and registration documents, both front passengers exited the vehicle, Ms. Edmonds gave the officers consent to search the car, and Ms. Hargrove gave the officers consent to search her person. Unbeknownst to the officers, the rear doors of the Crown Victoria did not open from the inside as the car was originally fitted for police use.

Because of this, the rear passenger, the Defendant Gaines began to climb from the rear compartment towards the front of the car in order to make his exit from the vehicle. Officer Shetterly, after observing Mr. Gaines' attempts to climb over the seat, opened the rear passenger door and instructed Mr. Gaines to exit the vehicle through the rear door. As a safety precaution, Officer Shetterly immediately began a pat down of Mr. Gaines. Officer Shetterly began patting the Defendant down, and testified that he felt a gun in the Defendant's waistband area. (Hr'g Tr. at 15). After discovering the gun, Officer Shetterly loudly yelled "GUN" to alert his fellow officers. (Hr'g Tr. at 15); *see also* Statement of Probable Cause, ECF No. 41-2. After discovery of the gun, the Defendant elbowed Officer Shetterly, punched Officer Schneider, and attempted to flee the scene. The officers eventually subdued the Defendant and recovered the firearm which had fallen from the Defendant's waistband.

In addition to those facts discussed above, this Court will now highlight several further findings of fact relevant to the analysis of this case. First, it is uncontested that there is indeed a crack in right portion of the windshield of the Crown Victoria. However, as will be discussed in more detail below, this Court does not believe it was possible for the police officers to see the crack in the windshield as they have described it. Furthermore, it is similarly uncontested that Officer Shetterly discovered the gun in the Defendant's waistband *before* Defendant made any evasive or assaultive movements towards the officers. It was only after yelling "GUN" that the Defendant became violent. The legal effect of this last fact will be discussed in the following sections.

## ANALYSIS

**A.  Government Has Failed to Show Probable Cause for Traffic Stop**

During the hearing conducted on November 10, 2010, this Court determined that the evidence presented in this case did not support a finding of reasonable suspicion for the police officers to make a stop of the Defendant's vehicle. (Hr'g Tr. at 84-85). During the continuation of the hearing conducted on December 6, 2010, this Court again reiterated its determination that the traffic stop was not supported by reasonable suspicion. Although this Court indicated the reasons for this determination on the record at both hearings, it will briefly reiterate its reasoning.

In *Whren v. United States*, the Supreme Court stated that the detention of an individual during a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment. 517 U.S. 806, 809-10 (1996). However, the Court also stated that such a detention must be reasonable. *Id.* Regardless of the officer's subjective intentions, an officer's decision to make a routine traffic stop is reasonable if the officer had "probable cause to believe that a traffic violation has occurred." *Id.* at 810. In *United States v. Hassan El*, the United States Court of Appeals for the Fourth Circuit held that a traffic stop does not violate the Fourth Amendment as long as the police officer has an objective right to stop a vehicle, "regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of criminal activity." 5 F.3d 726, 730 (4th Cir. 1993). In other words, as long as an officer has an objective right to stop a vehicle, for example because he witnessed it commit a minor traffic violation, evidence of a more serious offense will not be suppressed on the ground that the stop was pretextual. *Id.*

While the subjective intent of the police officers is not an issue to be addressed, there must be reasonable articulable suspicion to stop the car. *Whren*, 517 U.S. at 810; *Hassan El*, 5 F.3d at 730. The Government, in the evidentiary hearing conducted on November 10, 2010, introduced three photographs of the Crown Victoria purportedly showing the cracked

windshield.  One of the photographs, introduced as Government Exhibit 1, depicts a view of the Crown Victoria's windshield from the interior of the car, and although it clearly depicts a crack in the car's windshield, is of little use to this Court as it was taken from an angle and distance unavailable to the police officers when they made the traffic stop.  The other two photographs (Government Exhibits 2 and 3) are taken from the outside of the Crown Victoria and depict a crack in the windshield.  However, these two photographs are taken from a distance of only a few feet, and the crack in the windshield is barely visible.  As this Court noted in the evidentiary hearings, it simply strains credulity to believe that Officer Moro could see this crack from the rear seat of the police vehicle, past Officers Shetterly and Schneider, across an intersection, and as the Crown Victoria is turning away from the police car.  At the evidentiary hearing held on December 6, 2010, the Defendant introduced a number of photographs, one of which, Defense Exhibit 6, depicts the Crown Victoria from the rear.  It similarly strains credulity to believe that the three officers could see the crack in the windshield after following the car onto Mosher Street with the added visual impediments of a tinted rear window and three passengers blocking the officers' view of the windshield.

Put simply, this Court having heard the testimony of the police officers, and having reviewed the exhibits, finds as a factual matter that the officers could not have seen the very slight crack in the lower right portion of the Crown Victoria's windshield.  In other words, this Court concludes that the Government has failed to establish, through presentation of credible evidence, that the traffic stop in question was properly based on reasonable and articulable suspicion of unlawful conduct.

**B.  Taint of Illegal Seizure Was Not Attenuated**

**1.  The Attenuation Doctrine**

Generally speaking, evidence obtained in violation of the Fourth Amendment is inadmissible. However, a court may admit evidence that would not have been discovered but for police misconduct if the causal connection between the illegal conduct and the seizure of the evidence is sufficiently attenuated. *See Nardone v. United States*, 308 U.S. 338, 341 (1939) (at some point in the connection between illegal conduct and evidence "may have become attenuated as to dissipate the taint"); *Wong Sun v. United States*, 371 U.S. 471, 486 (1963) (an intervening "act of free will [may] purge the primary taint of the unlawful invasion"). In *Brown v. Illinois*, the Supreme Court enumerated three factors to determine whether an exception to the rule of exclusion was warranted under the attenuation doctrine: (1) the time elapsed between the constitutional violation and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. 422 U.S. 590, 603-04 (1975). In addition to announcing this three-part test, the Court indicated that the core issue underlying the attenuation analysis should be whether the evidence in question was acquired through the "exploitation of [the underlying] illegality." *Id.* at 599.

### 2. Alleged New, Distinct Crime and Attenuation

Having already determined that the initial traffic stop was not supported by probable cause, the issue before the Court is whether Defendant's subsequent actions, specifically his striking the police officers and attempts to flee, are intervening circumstances that purge the taint of the Fourth Amendment violation. The Government, relying primarily on *United States v. Sprinkle*, 106 F.3d 619 (4th Cir. 1997), argues that even if the traffic stop was illegal, the evidence obtained (the gun) is still admissible because Defendant's assaultive behavior towards the police officers constitutes an intervening circumstance that purges the taint of the Fourth Amendment violation.

In *United States v. Sprinkle*, the United States Court of Appeals for the Fourth Circuit held that "[i]f a suspect's response to an illegal stop 'is itself a new crime, then the police constitutionally may arrest [the suspect] for that crime.'" 106 F.3d 613, 619 (4th Cir. 1997) (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982). In *Sprinkle*, the Fourth Circuit concluded that the initial traffic stop of the defendant was unjustified." *Sprinkle*, 106 F.3d at 618-19. After the illegal stop, the police officer began to conduct a pat down of Sprinkle when Sprinkle pushed away from the officer and fled. *Id.* at 616. The police officer gave chase, and after running a short distance, Sprinkle drew a gun and fired at the pursuing officer. *Id.* The police ultimately apprehended Sprinkle, and seized the gun. Sprinkle argued, and the district court concluded, that the gun should be suppressed as the fruit of the illegal traffic stop. *Id.* The Fourth Circuit disagreed and held that "[w]hen Sprinkle drew and fired the gun at the officer, he committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop" and the officer then "had probable cause to arrest Sprinkle because the new crime purged the taint of the prior illegal stop." *Id.*

The Government, in the present case, argues that *Sprinkle* stands for the proposition that as long as a defendant who is the victim of an unconstitutional stop commits some crime after that stop, then that defendant may be arrested for that new crime and any evidence obtained thereafter is admissible because it is sufficiently attenuated from the initial constitutional violation. This Court does not read *Sprinkle* that broadly. *Sprinkle's* core holding is as follows: "If a suspect's response to an illegal stop is itself a new crime, then the police constitutionally may arrest [the suspect] for *that* crime." 106 F.3d 613, 619 (4th Cir. 1997) (internal quotation marks and citation omitted) (emphasis added). In Sprinkle's case, *that* crime was his drawing and firing of a gun at the pursing officer. *Id.* The Fourth Circuit, in holding that crimes

committed subsequent to illegal detentions should not be immunized, noted the troubling consequences that would flow from a contrary rule:

> There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. As the *Bailey* court recognized, "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct."

*Id.* (quoting *United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982).

However, even though a suspect may be constitutionally *arrested* after committing a separate and distinct crime after an illegal stop, it does not logically flow that *evidence* derived from that illegal stop, and unrelated to the new crime must automatically be admitted. As noted above, the Fourth Circuit cautioned that a rule disallowing evidence relating to a new and distinct crime would "virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Sprinkle*, 106 F.3d at 619. In the same vein, this Court concludes that a rule allowing the admission of illegally obtained evidence discovered before any criminal acts committed by a defendant would essentially immunize the police from any constitutional violations they may have committed on the road to discovery of the evidence. Although *Sprinkle* holds that a new crime committed by a defendant provides probable cause to *arrest* that defendant, the case does not hold that any illegally discovered evidence is automatically admissible as a result of a subsequent criminal act by the defendant.

Here, the sequence of events is clear and undisputed: vehicle stopped; Mr. Gaines ordered out of vehicle; Mr. Gaines patted down; Officer Shetterly discovers firearm and yells "GUN;" and then Mr. Gaines engages in assaultive and evasive behavior. It is clear, and undisputed by the Government, that the gun was discovered *before* any allegedly illegal activity

took place. Even assuming that Mr. Gaines' actions constituted assault, and were therefore illegal,[1] the fact remains that the gun was discovered as a direct result of the illegal traffic stop. Unlike *Sprinkle*, the gun in this case was discovered *before* any subsequent illegal activity. In *Sprinkle*, the gun was discovered as a direct result of the subsequent illegal activity—the police officers did not discover the gun prior to Sprinkle's drawing and firing the weapon, but discovered it as a result of the new crime. Here, the new crime is assault, and the gun was discovered prior to, and in a manner unrelated to, that new crime.

*Sprinkle* was recently analyzed by this Court in *United States v. Burke*, 605 F. Supp. 2d 688, 699-701 (D. Md. 2009) (Titus, J.). In that case, Judge Titus discussed the history of the attenuation doctrine, and made clear that *Sprinkle* is properly analyzed as an attenuation case. *Id.* Judge Titus quoted *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) for the three factors relevant to an attenuation inquiry, and noted that the central issue is the degree of attenuation between the illegal stop and the subsequent activity. *Burke*, 605 F. Supp. 2d at 699. In *Burke*, the defendant presented a fraudulent driver's license to the police after being illegally stopped. *Id.* at 692. After discussing the three attenuation factors, Judge Titus concluded that the new offense of presenting fraudulent identification was not sufficiently attenuated from the illegal stop and therefore granted the defendant's motion to suppress. *Id.* at 701. In making this ruling, Judge Titus noted that "it would be 'sheer fiction' to find that Defendant's presentation of fraudulent identification to police was caused by anything other than the illegal traffic stop. . . . There were

---

[1]  The parties disagree as to whether Mr. Gaines' actions subsequent to the illegal traffic stop constitute illegal criminal activity. Under Maryland law, a person is free to resist an unlawful warrantless arrest. *See* MD. CODE ANN., CRIM. LAW § 9-408(b)(1); *Shifflet v. State*, 560 A.2d 587, 590 (Md. 1989). Therefore, the issue of whether Mr. Gaines' actions are illegal turn on whether or not he was under arrest at the time he elbowed, punched, and otherwise fought with the police officers. If he was under arrest at the time of the scuffle, that arrest would be illegal as a result of the illegal traffic stop, and he would therefore be privileged to resist that arrest. This Court need not resolve that matter. It is clear that regardless of whether Mr. Gaines' actions were criminal, the gun was discovered as a direct result of the illegal traffic stop, and must therefore be suppressed.

absolutely no intervening circumstances and no lapse of time between the stop and the alleged 'new crime.'" *Id.*

As discussed by Judge Titus in *Burke*, the attenuation inquiry requires the application of the well accepted attenuation factors: "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* at 699 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Applying these factors, this Court concludes that there is no attenuation. First, there was very little amount of time between the illegal stop and the acquisition of the gun—the entire confrontation occurred in a matter of minutes, and constituted one continuous flow of activity. Second, as mentioned above, there was no intervening circumstance. The fight between the Defendant and the police cannot possibly be considered an intervening circumstance because the fight happened *after* the police found the gun. Because this single factor weighs so heavily against admitting the gun under the attenuation exception to the fruit of the poisonous tree doctrine, it is unnecessary for this Court to make a finding as to the third attenuation factor, the purpose and flagrancy of the official misconduct. Here, the gun was discovered *before* the assault, and the fact that Mr. Gaines engaged in allegedly unlawful behavior after the discovery of the gun does not expunge the government's unlawful conduct in making an illegal traffic stop. As a result, this Court concludes that because there were no intervening circumstances between the illegal stop and the discovery of the gun, the gun must be suppressed as fruit of the illegal stop.

In this case, this Court finds that there was no break in the causal chain of events between the illegal stop and the discovery of the gun. Therefore, the Defendant's conduct after the stop

did not purge the taint of the illegal seizure.  The gun was discovered through the "exploitation" of the illegal stop and must be suppressed.  *See Brown v. Illinois*, 422 U.S. 590, 599 (1975).

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion to Suppress Evidence (ECF No. 20) is GRANTED.

An Order of December 6, 2010 GRANTING the Defendant's Motion to Suppress Evidence was previously entered.  (ECF No. 56)  A separate Order directing the Clerk of the Court to transmit copies of this Memorandum Opinion to counsel follows.

Dated: December 8, 2010                            /s/_____

                                                                   Richard D. Bennett
                                                                   United States District Judge